■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v BRETT CADORETTE, Appellant. — Appeal by defendant from a judgment of the Supreme Court, Richmond County (Di Vernieri, J.), rendered April 26, 1979, convicting him of attempted murder in the second degree, assault in the first degree (two counts), burglary in the second degree (two counts), attempted rape in the first degree, sexual abuse in the first degree and petit larceny, upon a jury verdict, and imposing sentence. Judgment affirmed. We cannot agree with our dissenting colleagues that reversal of this conviction is mandated by errors in the Trial Judge's instructions to the jury. As to the charge on intent, the limited portion quoted in the dissent was admittedly violative of the holding in *Sandstrom v Montana* (442 US 510). However, the offensive language was only part of a lengthy charge on the subject which, for the most part, was clear and correct. And, in any event, any error in the charge on intent was clearly harmless. After he announced his intent to rape the complainant, the defendant led her to the bedroom of her home. There he touched her breast and, when she tried to stall for time, he grabbed her and produced a "blade". A struggle ensued, the blade was placed at the complainant's neck, and she fainted. When she lost consciousness, she was fully clothed. When her daughter later discovered her lying on the bedroom floor near death, the complainant was unclothed above the waist and exhibited various injuries, among which was a slash across her throat from ear to ear so deep that a treating physician would later testify that the cut "looked like a big open wound where you could see all the way back into the throat, and there was a lot of blood." In our view, it is entirely unrealistic to suggest that there was any ambiguity surrounding the intent with which the defendant slashed the throat of the complainant at a time when she may well have already been unconscious. Hence, we conclude that the *Sandstrom* error was harmless beyond a reasonable doubt. (See *People v Crimmins*, 36 NY2d 230.) The trial court's charge on alibi was likewise erroneous but harmless in the circumstances of this case. Alibi testimony was given solely by the defendant's mother. The close proximity between the defendant's home and the scene of the crime, coupled with the time sequences involved, suggest that the purported alibi was not entirely inconsistent with the defendant's commission of the crime. Moreover, the defendant failed to call his girlfriend who, according to his own statements and his mother's testimony, could have supported the asserted alibi. (Cf. *People v Rodriguez*, 38 NY2d 95.) And, in any event, the defendant's guilt was demonstrated by overwhelming evidence. The complainant testified that the defendant had gained entry into her home by representing himself as a landscaper and that, during the course of the crime, he had told her that his mother was a "witch" and that he did not like her. During a subsequent conversation with the police prior to his arrest, the defendant said that he was a free-lance landscaper who went from house to house to solicit business. He also told the police that he did not get along with his family. More important, however, was the manner in which the defendant came to the attention of the police and was subsequently identified as the perpetrator. Some nine days after the crime, the defendant approached a detective to ask about the progress of the investigation and to describe his psychic visions of the crime. In doing so, he revealed knowledge of an important detail of the crime scene which the police had withheld from the public. Having thus aroused police suspicions, the defendant was asked whether he would agree to be photographed. He did and his picture was subsequently selected unhesitatingly by the complainant from an array which is not challenged as unfair in any way. In court, the complainant positively

identified the defendant as the perpetrator and the record demonstrates that her identification was based on an ample opportunity to observe the defendant both prior to and during the crime. They had conversed for some 10 minutes in the complainant's home before the attack began. Thereafter, during the assault itself, the complainant observed the defendant at very close range for an additional period of time. In our view, therefore, the defendant's guilt was established beyond question and any error in the charge relating to his less than "air-tight" alibi must be deemed harmless. (See *People v Crimmins, supra.*) Finally, we note that no objection was raised at trial to any portion of the jury charge and, accordingly, the errors upon which the dissenters would reverse have not been preserved for review as questions of law. (See, e.g., *People v Thomas,* 50 NY2d 467.) And, unlike our dissenting colleagues, in view of the overwhelming proof of guilt, we are unpersuaded that this is a case which properly calls for the exercise of our interest of justice jurisdiction in the defendant's behalf. Mollen, P.J., Weinstein and Thompson, JJ., concur.

O'Connor, J., dissents and votes to reverse the judgment and order a new trial, with the following memorandum, in which Margett, J., concurs: The brutal acts attendant upon the crime, including the slashing of the victim's throat from ear to ear, caused considerable public interest and were daily reported, in some detail, in the local press. Nine days after the commission of the crime, Detective James Sharp, on duty in a marked radio patrol car, was approached by defendant, who identified himself and inquired if the police had obtained any information concerning the woman with the slashed throat. Upon receiving a negative response, defendant said that at about the time that the crime took place, to wit, approximately 3:15 P.M. on May 11, 1978, he and his girlfriend, both psychics, were walking in the area of the crime and that he "felt an uneasy feeling coming over [him that] something was wrong close by." Defendant recounted that he and his friend went into a psychic trance and that he had a vision of a man and a woman fighting and that the woman had blood on her and the man had a knife. He said he came out of the trance and saw the same man running down the street with a knife in his hand. Defendant agreed to speak again to the detectives and departed leaving his address. Two days later he came to the 122nd Precinct and, in greater detail, told Detective Anthony De Gise of his vision, this time stating that the injured woman was lying on the floor beside a bed, covered with blood, clutching a bunch of hair in her hand. The following day, during a prearranged hour-long meeting with Detective Alfred Siragusa, the officer in charge of the investigation, defendant repeated essentially the same story. Siragusa's suspicions were sharpened because he had not released this vital information (the finding of a clump of hair in the victim's hand) to anybody, including the *Staten Island Advance,* the local newspaper. Query: How then did defendant become aware of this important piece of evidence? It must, however, be noted that upon the trial the prosecution did not prove that the *Advance* did not print that fact in its stories. It should be further noted that scientific tests established that the tuft of hair was not that of defendant, that it was possibly that of the victim or of some unknown third party. In similar vein and despite medical testimony to the effect that the wound was big and open and that "there was a lot of blood", police laboratory tests revealed no traces of blood on a pair of defendant's shoes seized in a search of his home. At trial, defendant presented that most perfect of all defenses, an alibi, claiming that he was at home at the time the crime occurred. The only witness to this effect was Cadorette's mother, who testified that her son was home until 2:30 P.M. on the day in question, and that he left the house at that time with his girlfriend. Mrs. Cadorette then left for a short time and returned between 2:55 and 3:05 P.M., at which time the defendant was back in the house. The victim testified that defendant came to her house

between 2:45 and 2:50 P.M. and it appears that their houses are not far apart. Obviously, the alibi presented was not "air-tight". At the conclusion of the testimony, the court charged the jury with respect to alibi as follows: "Evidence with relation to an alibi should be most carefully scrutinized * * * The defendant is not required to prove an alibi beyond a reasonable doubt, but you must be satisfied as to the truth of the alibi * * * If you believe that [alibi] testimony, of course, you must acquit him. *If you don't believe that testimony, you may convict him.*" (Emphasis supplied.) Additionally, the court charged the jury with regard to intent. The court stated: "On the question of intent, the law says that a person is presumed to intend the natural and probable consequences of his act * * * Crimes are ordinarily secret, and a person does not advertise beforehand or say beforehand what he intends to do. So the law says that a person is presumed to intend that which he actually does." During deliberations, the jury requested further instruction as to intent, as well as to the definition of attempted murder. The charges were repeated in their entirety. No objections or exceptions were raised by defense counsel to these charges at any time during the course of the proceedings. Although this court may not reverse a judgment of conviction, as a matter of law, when no objection is raised or exception taken to an erroneous charge by the court, we may do so in the interest of justice when, in our discretion, the facts warrant such a reversal (see *People v Thomas,* 50 NY2d 467; *People v Jones,* 74 AD2d 854). This case calls for the exercise of that discretion. The case at bar may be termed one of "pure identification". There is no evidence to connect the defendant to the crime alleged, but for the identification of him by the complainant. (If anything, the evidence of the hair in the victim's hand may, in fact, point to another, unknown assailant.) Obviously, the question of defendant's alibi is a very critical issue in these circumstances, and the trial court's charge on this subject was not only inadquate, but improper. To tell the jury that if it doesn't believe the defendant's alibi it may convict him has the effect of shifting the burden of proof from the prosecution to the defense, virtually requiring truth of the alibi as a condition for the existence of reasonable doubt. The court should have charged instead, that if the evidence as to alibi, in and of itself or when taken into consideration with all the other evidence in the case, created a reasonable doubt as to the guilt of the defendant, he was entitled to be acquitted (see *People v Barbato,* 254 NY 170, 179; *People v Jones,* 74 AD2d 515). Likewise, the court's charge on the question of intent improperly shifted the burden of proof to the defendant. To instruct a jury that it *is presumed* that a person intends the natural and probable consequences of his acts necessarily impairs that jury's fact-finding process. Rather, the jury should be told that it *may infer* a person's intent from the natural consequences of his actions. The court's charge, as given and repeated, was erroneous (see *Sandstrom v Montana,* 442 US 510; *People v Getch,* 50 NY2d 456; *People v Jones,* 74 AD2d 854, 856, *supra).* In light of the facts and circumstances of this case as discussed above, we cannot conclude that the errors in the charge were harmless (see *People v Crimmins,* 36 NY2d 230, 241). We would, therefore, reverse and order a new trial.